(93 South. 788)

No. 24722.

## TEXALA OIL & GAS CO. v. CADDO MINERAL LANDS CO. et al.

(April 24, 1922. On Application for Rehearing, June 1, 1922. On the Merits, June 29, 1922. Rehearing Denied by the Whole Court Oct. 19, 1922.)

*(Syllabus by Editorial Staff.)*

I. **Appeal and error** ☞657(I)—**Case remanded for incorporation in transcript of records omitted by clerk.**

Where original records of other suits were admitted in evidence under Act No. 43 of Extra Sess. 1870, but the clerk failed to include transcripts of such records in the transcript on appeal, case remanded for their incorporation in the transcript or in a supplemental transcript.

On the Merits.

2. **Mines and minerals** ☞78(4)—**Failure to drill well within time stipulated held to dissolve contract without putting lessee or assignee in default.**

Under an oil and gas lease, providing for the drilling of certain wells, and that within one year one well should be drilled to a deep strata of oil, and that the lessee's failure to carry out any of the agreements therein should terminate the lease, the lessee's failure to drill the deep well within the time required dissolved the contract without putting the lessee or his assignee in default for the breach, especially where all operations had ceased for more than 60 days in violation of the agreement.

3. **Mines and minerals** ☞78(I) — **Time for drilling held to be of the essence of oil and gas lease.**

Where an oil and gas lease required the lessee to commence drilling to a certain depth within 60 days, and within one year to drill a well to a deep strata of oil, time was of the essence of the stipulation to drill the deep well and for the development of the property in general.

4. **Mines and minerals** ☞78(I) — **Litigation over title to part of land held not to excuse drilling of well within time stated.**

Where an oil and gas lease required the drilling of certain wells and provided for the drilling within one year of a well to a deep strata of oil, the drilling of such well was not excused by the pendency of litigation over the title to part of the land, where it did not involve the subdivision selected by the holder of the lease for the deep well, or any subdivision on which it had a well.

5. **Mines and minerals** ☞78(I)—**Failure to drill well not excused by inability to obtain casing after time for drilling had expired.**

The drilling of a well to a deep strata of oil within one year, as required by an oil and gas lease, was not excused by the leaseholder's inability to procure the necessary casing, where this condition arose several months after the time had elapsed for drilling the well, and it did not appear that casing could not have been procured had the well been drilled within the time stipulated, and the lessor had done nothing to justify the lessee in believing that the time would be extended.

6. **Mines and minerals** ☞78(I) — **That pipe lines would not accept oil held not to excuse drilling of well as agreed.**

The drilling of a well to a deep strata of oil within one year, as required by an oil and gas lease, was not excused by the fact that pipe lines would not accept oil for transportation, where by constructing a small pipe line and building a switch the leaseholder could have shipped the oil by rail.

**7. Estoppel ☞9—Admissions of lessor after granting of lease as to prior lease could not bind lessees.**

A lessor's answers in suits in which it was called in warranty and the testimony of its president therein, to the effect that it had given an oil and gas lease, and that the lessee or his assignee was in possession, could not prejudice the rights of one to whom it had given a subsequent lease before the filing of such answers, or the giving of such testimony.

**8. Estoppel ☞3(3), 69—Pleading and testimony, admitting giving of lease and possession thereunder, held not to estop lessor from asserting forfeiture.**

Where the assignee of a lease sued for slander of title, called the original lessee in warranty, and the lessee called the lessor in warranty, the lessor's answers admitting that it had given the lease, and that the lessee or his assignee was in possession, and the testimony of its president to the same effect, coupled with the defense that it had a right, as against the party suing, to make such lease, did not estop it from asserting, as against the assignee of the lease, that it had been forfeited for noncompliance with its conditions.

**9. Mines and minerals ☞78(1)—Holder of lease bound to comply therewith without waiting for protest.**

Where an oil and gas lease required the drilling of a deep well within one year, the holder of the lease was bound to comply with the contract to keep it in force, and could not wait for a protest before complying.

**10. Mines and minerals ☞78(1)—Lessor only bound not to mislead lessee into thinking it need not comply with lease.**

Under an oil and gas lease requiring the drilling of a deep well within one year, and providing that failure to carry out any of the agreements thereof should terminate the lease, the only obligation of the lessor was not to mislead the lessee into thinking that it might depart from the contract in any essential particular or fail to comply with it without suffering the consequences, and it was under no obligation to protest against the lessee's expenditure of large sums of money in developing the property.

**11. Mines and minerals ☞78(5)—That lessee failing to comply with lease, spent large sums of money in developing property, did not estop lessor from insisting upon forfeiture.**

Where the holder of an oil and gas lease, requiring the drilling of a deep well within one year and providing for termination for failure to carry out any of the agreements thereof, failed to drill such well, and the lessor did nothing to mislead it into thinking that it might depart from the contract, the fact that it spent large sums of money to develop the property did not estop the lessor from asserting a forfeiture.

**12. Mines and minerals ☞78(7)—Facts terminating contract must be shown, and dissolution of lease obtained by judicial action.**

Though an oil and gas lease in terms provided that it should terminate and become null and void upon failure to drill a deep well within one year, or upon suspension of operations for more than 60 days, or upon failure to comply with its terms in other respects, the facts must be shown, and the dissolution of the contract obtained by judicial action.

**13. Mines and minerals ☞78(7)—Forfeiture of lease could be set up in lessee's suit for possession without restoring possession and suing for dissolution.**

Under Civ. Code, art. 2047, providing that dissolution of a contract may be demanded by suit or by exception, where holder of oil and gas lease, requiring the drilling of deep well within one year, and prohibiting suspension of operations for more than 60 days, and providing for termination upon failure to carry out any of the agreements thereof, did not drill such well, and, though when a subsequent lessee took possession its property used on the lease was still thereon, no one was in charge of the premises, or had been for some months, the subsequent lessee and the lessor could, when sued by the prior lessee for recognition of its ownership of the lease, set up the defense of forfeiture without first restoring the property and then suing to dissolve.

**14. Mines and minerals ☞78(2)—Failure of lessee to drill deep well as provided held to preclude assertion of rights acquired by drilling shallow wells.**

Where oil and gas lease required a well to be drilled to a deep strata of oil within one year, and also required two wells to be drilled for every 40 acres, and provided that every two wells so drilled would hold the lease on 40 acres, and that failure to carry out any of the agreements thereof should terminate the lease, the holder of the lease upon failure to drill the deep well could not hold the 40 acres for each two shallow wells drilled.

**15. Mines and minerals ⊜⇒78(1)—Lease held to govern lessee's rights in wells drilled under earlier lease when property embraced in lease.**

Where, prior to an oil and gas lease requiring the drilling of certain wells, and providing for termination for failure to comply with any of its agreements, the lessee had drilled two wells on the property under a former lease, but the property on which they were located was included in the lease, it was the evident intention that they should be governed by the latter lease.

**16. Mines and minerals ⊜⇒81—Judgment rejecting plaintiff's demand as lessee held to reserve right to sue for property used or destroyed by subsequent lessee.**

In suit by holder of oil and gas lease for recognition of its ownership of the lease and to cancel a subsequent lease, where it appears that plaintiff's rights under the lease have been forfeited, but there is evidence that the subsequent lessee used some of plaintiff's property, the right to sue for property so used or destroyed will be reserved by the judgment rejecting plaintiff's demand.

**17. Appeal and error ⊜⇒238(4), 878(1) — Judgment so far as it dissolves sequestration not disturbed, when plaintiff has not appealed or moved to amend.**

A judgment, so far as it dissolved a sequestration issued on plaintiff's petition, cannot be disturbed on appeal, when plaintiff has not appealed, nor filed a prayer for the amendment of the judgment.

Appeal from First Judicial District Court, Parish of Caddo; John R. Land, Judge.

Suit by the Texala Oil & Gas Company against the Caddo Mineral Lands Company and others. From a judgment for plaintiff, the named certain defendants appeal. Affirmed in part, and annulled and set aside in part, and plaintiff's demand rejected.

Wilkinson, Lewis & Wilkinson and J. S. Atkinson and Alex F. Smith, all of Shreveport, for appellants.

Barret & Files, of Shreveport, for appellee.

Wm. Winans Wall, of New Orleans, and A. D. Keeney and M. D. Dimitry, both of Shreveport, for amici curiæ.

By Division A, composed of PROVOSTY, C. J., and OVERTON and LECHE, JJ.

OVERTON, J.   Plaintiff alleges that it is the owner of a valid mineral contract of lease of certain lands in the parish of Caddo, granted by the Caddo Mineral Lands Company.   This lease plaintiff alleges it holds by a regular chain of assignments.

Plaintiff further alleges that after it had spent large amounts of money in developing the property, and after its further development had been interrupted by suits to annul the lease, which are still pending, and were instituted by H. J., V. T., and M. P. Lenoir, and are numbered 25283, 25284, and 25268 of the docket of the trial court, and are entitled Lenoir v. Texala Oil & Gas Co.; and after the Caddo Mineral Lands Company, under which it holds, had alleged in the Lenoir suits the validity of plaintiff's lease, and after the president of that company had testified to the validity thereof, said company pretended to grant, notwithstanding, a lease of the same kind, and on the same land, to Wilmot J. Homer, under which, by a pretended chain of assignments, one M. G. Peck now claims to hold.

Plaintiff further alleges that the Caddo Mineral Lands Company and W. J. Homer and the assignees of the Homer lease have bound themselves together to defraud it of its rights and property; that they have entered upon said land and have taken possession thereof, and are pumping the oil from plaintiff's wells and using its machinery and other property on the leased premises. Plaintiff therefore sues these defendants in solido for $25,000, the alleged value of its rights and property, of which property plaintiff alleges it has been unlawfully deprived. Plaintiff also sues to be recognized as the owner of the first lease granted by the Caddo Mineral Lands Company, which it holds by assignments from the grantee, and of certain property on the leased premises, and to

have canceled and erased from the records of the recorder's office the lease granted by that company to Homer and the assignments thereof made by Homer and his assignees, and prays that a judicial sequestrator be appointed to hold the property during the pendency of the suit. In an amended petition plaintiff prayed for and obtained a writ of sequestration, ordering the sheriff to sequester the property.

The Caddo Mineral Lands Company and P. L. Hart, another of the defendants, answered the suit. Both aver the validity of the lease granted to Homer and the validity of the assignments thereof, and aver that, at the time this lease was made, the lease under which plaintiff claims had become void by the failure to comply with its terms, and further, that plaintiff had abandoned the property. Both of these defendants deny the allegations in plaintiff's petition, which declare that, in the three Lenoir suits, the Caddo Mineral Lands Company had alleged the validity of the lease, under which plaintiff claims, and deny that the president of that company had testified on the trial of those suits that plaintiff's lease was valid. The defendant Hart avers that the assignees of the Homer lease bought on the faith of the public records, and both defendants aver that possession of the property under said lease was taken openly, and that plaintiff had knowledge thereof, and stood by without protest until after large amounts of money had been spent in developing the property, and a producing well had been brought in, before plaintiff asserted its claims, and they aver that plaintiff is therefore estopped. They pray that plaintiff's demand be rejected.

In the court below plaintiff was successful to the extent of having its lease recognized and of obtaining a decree placing it in possession of the property and of obtaining a further decree directing the cancellation of the Homer lease and the assignments there-

of, but the writ of sequestration was dissolved, and plaintiff's demand for damages nonsuited. The right was reserved defendants to sue for the value of the improvements placed by them on the premises, less the amount received by them as revenues from the property.

Both Hart and the Caddo Mineral Lands Company have appealed.

[1] On the trial, plaintiff offered in evidence the proceedings in the three Lenoir suits, including the evidence offered in each. While the offerings do not so state, yet they were evidently made for the purpose of substantiating in part the allegation of plaintiff's petition to the effect that the continued development of the property by it was interrupted by those suits, and for the further purpose of proving its allegation that the Caddo Mineral Lands Company in those suits had alleged the validity of plaintiff's lease, and that the president of that company had testified in them that the lease was valid.

The three suits mentioned were not incorporated in the transcript, nor made part of it in any manner, nor does it appear why they were omitted. The clerk has concluded the transcript with the usual certificate that it includes the evidence, and a true and correct copy of all papers filed, orders made, and proceedings had in the case. No motion has been made to dismiss the appeal, nor has any effort been made to supply the deficiency in the transcript.

The allegations, which the above evidence was offered to sustain, are still relied on by plaintiff, and are discussed in the briefs of both plaintiff and defendants. The evidence was admitted by the lower court, though over the objection of defendants. Without it we are unable to determine the issue.

It does not appear that the omission was due to the fault of the appellants. We in-

fer that the original records were offered instead of certified copies thereof, and when an appeal was taken, and the clerk found no certified copies thereof in the record, he made none in making the transcript, and hence the omission.

However, Act No. 43 of 1870 (Extra Sess.) authorizes parties litigant to offer in evidence original records from the archives of the court. When the evidence offered on the trial is taken down, and such an offering is made, the act provides that an entry shall be made of the offering in the notes of evidence, and that it shall not be necessary to make a copy of the record offered, unless an appeal be taken, in which event the transcript of the record offered as evidence shall be made from the original.

The omission of these records from the transcript was doubtless due to the failure of the clerk to carry out the mandate of the above statute, and not to the fault of the appellants. We have therefore concluded to remand the case for the purpose of having incorporated in the transcript, or in a supplemental transcript, the three records mentioned, or so much thereof as the parties to this suit, acting under Act No. 229 of 1910, may find necessary. Becnel v. Louisiana Cypress Lumber Co., 134 La. 467, 64 South. 380.

For the reasons assigned, it is ordered, adjudged, and decreed that this case be remanded to the lower court for the purpose of including in the transcript, or in a supplemental transcript, so much of said omitted records as the parties to this suit may find necessary, as provided by said Act of 1910, and in default of directions as provided by said act, that a transcript of said entire three records be returned to this court, within 30 days from this date, to the end that this appeal may be disposed of.

On Application for Rehearing.

By the WHOLE COURT.

PER CURIAM. This case was ordered remanded to the district court for the purpose of having incorporated in the transcript of appeal the records in three other suits, which records had been offered in evidence in the district court. This court, therefore, did not pass judgment on the merits of the case. The defendants and warrantor have asked for a rehearing upon their filing in this court a supplemental transcript containing the records that were omitted; and, within the delay allowed by the order of this court, they have filed the supplemental transcript.

It is therefore ordered that the decree of this court, of date the 24th of April, 1922, remanding the case, be rescinded, and that this case be now considered as having been again submitted for decision.

LAND, J., recused.

On the Merits.

By Division A, composed of PROVOSTY, C. J., and OVERTON and LECHE, JJ.

OVERTON, J. The issues to be determined in this case are stated in the opinion remanding it. Briefly restated for the purpose of convenience, they are as follows:

The Caddo Mineral Lands Company granted a contract of lease on certain land to Oscar Shanks to explore for minerals. Plaintiff claims the right to explore for minerals on this land by a regular chain of assignments from Shanks. The Caddo Mineral Lands Company thereafter granted another contract of lease on the same land, for the same purpose, to Wilmot J. Homer, which, plaintiff alleges, in substance, one M. G. Peck now claims to own, through a pretended chain of assignments from Homer. The defendants aver that the lease granted to Shanks, and now claimed by plaintiff, was forfeited because of a failure to comply with its conditions, and, in fact, that it was aban-

doned. Plaintiff contends that the lease is still in full force and effect, and was not abandoned, and that defendants are estopped to contend that it was forfeited, and prays that the Homer lease, and the assignments thereof, be canceled and erased from the public records, and that its lease be recognized as being of full force and effect. Plaintiff also sues the Caddo Mineral Lands Company, W. J. Homer, and the assignees of the Homer lease in solido for $25,000. This demand is based on the allegation that those defendants have bound themselves together to defraud plaintiff of its rights and property, and have taken possession of the leased premises, and are pumping the oil from the wells, and are using the machinery and other property belonging to it and located thereon. Defendants deny all liability on this demand, and deny the allegations upon which it is based.

The lease to Oscar Shanks by the Caddo Mineral Lands Company was granted in December, 1917. Shanks sold to Thomas A. Nevins in August, 1918. Nevins sold to plaintiff in September of the same year.

In so far as it is necessary to state the terms and conditions of the lease, they are as follows:

"It is further mutually agreed by and between the parties hereto that the second party [Shanks] shall commence a well under this grant, conveyance and lease within 60 days from the signing of this agreement, by drilling for gas or oil thereon, that is found at a depth of approximately 1,025 feet, and that within a year from the signing of this agreement one well is to be drilled to the deep strata of oil that is supposed to be found at a depth of approximately 2,300 feet.

"At least two wells to be drilled for every forty acres, and that every two wells so drilled will hold the lease on forty acres of land.

"When the wells cease to operate as producers the land reverts back to the party of the first part.

"The failure of said party of the second part [Shanks] to carry out any of the agreements as above set forth, shall terminate this lease, and the same shall become null and void, not more than 60 days shall elapse between the completion of one well and the commencement of another, should operations cease for a period exceeding sixty days, this lease shall become null and void, strikes and acts of God excepted."

Prior to the execution of the above lease, there apparently existed another on the land in controversy. This was purchased by Shanks at sheriff's sale from D. H. Willard, in the latter part of July, 1918, after the execution of the lease to him by the Caddo Mineral Lands Company. This lease is not mentioned in the transfers of the Shanks lease, nor is it in evidence, and we take it that it is not relied on by plaintiff. Not being in evidence, its terms are unknown to us. It is not mentioned in plaintiff's petition.

Prior to the granting of the lease to Shanks by the Caddo Mineral Lands Company, the former drilled and pumped two shallow wells on the S. E. ¼ of the S. W. ¼ of section 24, a part of the premises on which the lease was granted. The deeper of these wells was 1,107 feet. After the execution of the lease, Shanks started a third well, but before he completed it he sold to Nevins, a few days over eight months after the lease was granted. Nevins held the lease for something over a month, when he transferred it to the Texala Oil & Gas Company, the plaintiff herein. Nevins, during the short period in which the title to the lease stood in his name, does not appear to have made any effort to develop the property. Plaintiff, however, drilled a shallow well on the property, and finished the one Shanks had begun, which was also shallow. One of these was in the S. W. ¼ of the S. W. ¼ of section 24, and the other in the N. W. ¼ of the N. W. ¼ of section 25. Plaintiff started a third well on the latter tract, which, we gather from the evidence, was to have been a deep one. This well was drilled, however, only to a depth of about 170 feet, when plaintiff contends that operations were

suspended for two reasons, one of which was that it could procure no 10-inch casing for it, and the other was because of the institution of three suits, involving a part of the land on which the lease was granted, one of which was instituted by H. J. and M. P. Lenoir, and the remaining two by H. J. Lenoir and V. T. Lenoir, respectively. Plaintiff was about to drill another well on the S. W. ¼ of the S. W. ¼ of section 24, when it says that it suspended operations on account of the same suits.

Drilling operations ceased in February, 1919, over a year after the granting of the lease to Shanks. At the time of their cessation, plaintiff discharged all of its employees, with the exception of two. It discharged those two in August following.

The two wells drilled by Shanks were small producers, and up to the time of the trial of this suit were still so. The one drilled by plaintiff and the one begun by Shanks and completed by plaintiff were not pumped sufficiently to determine whether they would produce in paying quantities. All that the evidence shows is that they did produce some oil. They were not being pumped at the time of the institution of this suit. Shanks produced sufficient oil to pay a small royalty to the Caddo Mineral Lands Company, but plaintiff paid no royalty at all. The latter pumped the small quantity of oil that it produced into a pit, and used it for fuel.

The above statement shows the development of the property under the Shanks lease. From it, to summarize, it appears that unless Shanks should be given credit for the two wells that he drilled prior to the granting of the lease in controversy, his effort resulted in merely commencing a shallow well, and that of plaintiff, in finishing the well that Shanks had begun, in drilling another, and in starting a third. Neither the well finished by plaintiff nor that begun and drilled by it is a deep one. Both are shallow, and are of approximately the same depth as the two drilled by Shanks. It requires from 10 to 25 days to drill a shallow well. The deep well, which the contract stipulates should be drilled within one year, was not drilled by Shanks, nor by his assignees, nor by anyone.

[2, 3] The royalties, that the lessor hoped to obtain by the successful exploitation of the property for oil and gas, constituted the true consideration for the granting of the lease. We need not go further than to say that the failure to drill the deep well within the time required by the contract, or for that matter the failure to drill it at all, should result in the dissolution of the contract, unless for some valid reason plaintiff was excusable in not drilling it up to the time the assignees of the Homer lease entered upon the leased premises, and began operations, or unless defendants are estopped to plead the forfeiture of that instrument.

Time was of the essence of the stipulation to drill the deep well, and for the development of the property in general. There was something to be done within a fixed time, and the failure to do it, even without putting the lessee or his assignee in default for the breach, affords sufficient ground to dissolve the contract. Talley v. Lawhon, 150 La. 25, 90 South. 428; Murray v. Barnhart, 117 La. 1023, 42 South. 489; Jennings-Haywood Oil Syndicate v. Houssiere-Latreille Oil Co. et al., 119 La. 859, 44 South. 481. More than two years elapsed between the signing of the Shanks lease and the granting of the one to Homer, and the taking of possession under the latter. Notwithstanding this, all that can be said is that the drilling of the deep well was only begun. It was not drilled, as provided by the contract.

Plaintiff, however, contends that it is excusable for not having drilled the deep well for two reasons, as already stated, one of

which is the filing of the Lenoir suits and the other, because it could not procure the 10-inch casing necessary for the purpose.

[4] In our view, the Lenoir suits did not present a sufficient reason for not having drilled the well, and were hardly the cause of that failure. To begin with, the year had expired, in which the well should have been drilled under the contract, several months before the filing of those suits. About 50 days before they were filed, plaintiff ceased operations on the lease, and discharged all of its employees thereon, except two. It does not appear that the Lenoir suits were even threatened at that time. Moreover, while the Lenoir suits involved a part of the tract that plaintiff had under lease, yet they did not involve the N. W. ¼ of the N. W. ¼ of section 25, which plaintiff had selected as the place to drill the deep well, and where it had actually begun drilling it; nor did they, for that matter, involve any similar fraction of a section on which plaintiff had a well. There was no practical reason why plaintiff should have suspended operations on account of those suits, nor do we think there is any legal reason why it should have done so.

[5] In so far as respects the second reason for not drilling the well, that of being unable to procure the 10-inch casing necessary, this condition arose, according to the evidence, at the time of the cessation of operations, which was several months after the time had elapsed in which the well should have been drilled. It does not appear that if it had been drilled during the year stipulated in the contract the casing could not have been procured. Plaintiff, having failed to drill it then, cannot avail itself of a condition that arose after the time prescribed for the drilling of the well, as an excuse for not fulfilling its obligation. The Caddo Mineral Lands Company had done nothing to justify plaintiff in believing that the con-

tract had been, in effect, so modified as to give it, as a matter of right, further time within which to drill the well, and plaintiff had done nothing, after the expiration of the time fixed by the contract, except to begin drilling it.

[6] There is another reason, which may be considered as one urged why operations for development were suspended, though in reading the evidence it appears rather as a reason for not pumping the two wells drilled by plaintiff. That reason is that the pipe lines would not accept for transportation oil pumped from new wells. The reason, however does not appear sufficient. Plaintiff was not dependent on the pipe lines. It might have shipped by rail. This is made apparent by the fact that Hart, the present assignee of the Homer lease, ships the oil that he produces in that way. It was necessary, it is true, to construct a small pipe line to the railroad, and to build a switch. This, however, did not deter Hart from developing the property successfully, and should not have deterred plaintiff under what appear to be identical conditions.

For the above reasons, we conclude that plaintiff is without a valid excuse for failing to comply with the contract, and therefore has forfeited it. Not only are we of the opinion that it has forfeited it, for the above reasons, but also for the reason that, if it did not in fact abandon the contract, it at least violated it by suspending operations for over a year before Hart, the assignee of the Homer lease, took possession; the contract providing that if operations should cease for more than 60 days for any cause, strikes and the acts of God excepted, it should be deemed at an end.

[7, 8] Plaintiff, however, contends that the defendants are estopped to plead the forfeiture of the lease. The chief ground 'for the estoppel pleaded is that the Caddo Mineral Lands Company admitted, in answers

filed in the Lenoir suits, that it had granted to Shanks a valid lease, and that its president testified to that effect in each one of those suits. The Lenoir suits were suits for slander of title brought against the plaintiff herein, who called in warranty its assignor, Shanks. Shanks called in warranty his lessor, the Caddo Mineral Lands Company. That company filed answers in each of the suits in which it admitted that it had granted to Shanks a mineral lease on the property, and that Shanks, or his assignee, was the owner of the lease, and was in possession thereunder, and had been for over a year. The president of the company testified to the same effect. The answers were not filed until June, 1920, and the evidence of the president was not given until after that time. The Homer lease was granted in April of the same year. As the answers were filed and the evidence given after the granting of the Homer lease, it follows that neither Homer nor those holding from him could, in any event, be prejudiced thereby, in their rights; nor do we think that there is anything in the answers or in the evidence that would estop even the Caddo Mineral Lands Company from contending that the lease had been forfeited by a failure to comply with its conditions. The fact that the lease was granted, and the further fact that Shanks or his assignee was still in possession, do not imply that there was a compliance with the terms of the lease. Those facts were not even urged as a defense, and therefore the Caddo Mineral Lands Company did not even avail itself of them, as urged by plaintiff, to defeat the suits. The admission as to the granting of the lease was merely an admission of a fact upon which the Lenoirs based their actions of slander of title. The Caddo Mineral Lands Company was called upon to admit or deny that fact. It admitted it, and as a defense set up that it had a right to grant the lease, because it had reserved the mineral rights in the property in selling to the Lenoirs. To this admission, that company added the averment of possession in Shanks or his assignee, which, we have seen, does not affect the question of estoppel under consideration.

[9-11] Plaintiff also urges that it has spent large sums of money in developing the property, without any protest from the Caddo Mineral Lands Company, and urges estoppel on that ground. The evidence shows that it has expended considerable money for that purpose. It also shows that a representative of the Caddo Mineral Lands Company visited the property on several occasions, when work was in progress, and made no complaint. It, however, does not appear when the visits were made, or whether there was then any cause for complaint. It was plaintiff's duty to comply with the contract in order to keep it in force. By its terms the contract made it so. Plaintiff was without right to fail to observe its terms, and wait for a protest before complying. The only obligation that the Caddo Mineral Lands Company was under to plaintiff in this respect was not to mislead it into thinking that it might depart from the contract in any essential particular, or fail to comply with it, without suffering the consequences. There is no evidence that would justify the conclusion that the Caddo Mineral Lands Company did anything of that kind. The fact that plaintiff spent large sums of money to develop the property, under the circumstances, does not affect the question. Plaintiff might have spent the money, which it did, without complying with the contract; and, as the evidence does not show that plaintiff was misled into that course by the Caddo Mineral Lands Company, no estoppel can possibly arise. This plea has no application as to the defendant Hart, who, in so far as the record discloses, had not even any knowledge of the fact that the money was

spent without protest from the Caddo Mineral Lands Company.

[12, 13] Although the contract, by its terms, states that it shall terminate and become null and void by a failure to comply with it by drilling the deep well, and by a suspension of operations for more than 60 days, for any cause, strikes and the acts of God excepted, and by a failure to comply with its terms in other respects, still the law contemplates that those facts must be shown and the dissolution of the contract obtained by judicial action. It is not necessary, however, to bring a suit to dissolve. The same result may be had by way of exception. C. C. art. 2047. The defendants, in this case, have adopted the latter course, and, as we have seen, have set up the forfeiture of the contract as one of the reasons why they should not be required to surrender the leased premises. We see no reason why they should not be permitted to pursue that course. It is true that, at the time Hart took possession of the premises, plaintiff still had thereon practically all of the property that it had used on the lease. Nevertheless, there was no one in charge of the premises, and there had not been for some months. Hart took possession openly and peaceably. He did so under circumstances showing that plaintiff had forfeited its lease, and indicating that it had no intention of resuming operations. Under those circumstances, we think that both Hart and the Caddo Mineral Lands Company should be permitted to avail themselves, in this case, of the defense of forfeiture, without first restoring the property. It doubtless would be otherwise had Hart taken possession, for instance, while plaintiff was still developing the property, or by means not peaceful, or over plaintiff's protest at the time, and the like.

[14, 15] Plaintiff asks, in the event we fail to recognize his lease as still being of force, then that we recognize his right to the four wells drilled under the Shanks lease, and his right to hold 80 acres of land as provided by that contract. This claim is based on that provision of the contract which reads:

"At least two wells to be drilled for every forty acres, and that every two wells so drilled will hold the lease on forty acres of land."

However, that provision must be interpreted in connection with other provisions of the lease. It is dependent on the drilling of the deep well. To interpret it otherwise would make it possible to hold the lease on the entire tract, by drilling the required number of wells, though only shallow ones, when the lease unmistakably contemplates that the failure to drill a deep well shall cause it to terminate and make it null and void. It is true that two of the wells were drilled under a former lease, by Shanks, but the property on which they are located was incorporated in the lease in question; and it was the evident intention of the parties that those wells should be governed by the latter lease.

Plaintiff also asks, in the event we should reach the conclusion we have, on the main question involved herein, then that its right to the material and equipment placed by it on the property be recognized. Defendants do not question plaintiff's claim, in that respect; at least, as to the movable property placed thereon. We are unable, however, to designate with certainty from the evidence plaintiff's equipment and material. Its right, nevertheless, will be reserved to remove it, and, out of precaution, to sue for it, should it deem it necessary or advisable. It is clearly entitled to all of it.

[16] In respect to plaintiff's suit for damages for the unlawful deprivation of its rights and property, it follows from the conclusion we have reached that this claim can-

not be allowed. However, in rejecting it, in view of the fact that there is evidence showing that Hart used some of the property placed by plaintiff on the lease, we shall reserve the right to plaintiff to sue for its use, and to recover such damage as it may have sustained thereby, and should any of it have been lost or destroyed through the fault of defendants, to sue for its value, and for any damage that may have been occasioned thereby. We are unable from the record to estimate the proper charge for the use of the property used by Hart, and hence the reservation we have made in that respect.

[17] In so far as relates to the sequestration issued on the petition of plaintiff, it was dissolved by the lower court. Plaintiff has not appealed, nor has it filed a prayer for the amendment of the judgment. Therefore the judgment of the lower court cannot be disturbed in that respect. However, the evidence would not justify us in disturbing it, even had a prayer for the amendment of the judgment been filed.

For the reasons assigned, it is ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and set aside, except as to the dissolution of said writ of sequestration, in respect to which, it is affirmed; and it is further ordered, adjudged, and decreed that plaintiff's demand be rejected and disallowed, reserving to it, however, the right to remove from said premises the material and equipment placed by it thereon, and if deemed necessary or advisable to sue for it; and reserving to it the right to sue for the value of any of it that may have been lost or destroyed through the fault of defendants, and to sue for the use of any of it that may have been used by any of the defendants. It is further ordered that plaintiff pay the costs of both courts.

Rehearing refused by the WHOLE COURT.