C. Graham **PEMBROKE** et al., Plaintiffs-Appellees-Cross Appellants,

v.

**GULF OIL CORPORATION,** Defendant-Appellant-Cross Appellee (two cases).

No. 71–1241.

United States Court of Appeals, Fifth Circuit.

Dec. 27, 1971.

Rehearing Denied Jan. 24, 1972.

John E. Bailey, Melvin Evans, Booth Kellough, New Orleans La., for defendant-appellant-cross-appellee.

Arthur C. Reuter, Reuter, Reuter & Schott, New Orleans, La., Attorneys for plaintiffs-appellees-cross-appellants.

Before THORNBERRY, MORGAN and CLARK, Circuit Judges.

THORNBERRY, Circuit Judge:

Gulf in the instant case appeals from a judgment of the district court entered in Pembroke's favor for $248,657.00. Liability was based on Gulf's breach of contract in flooding Pembroke's land in excess of certain contract rights granted. Finding Gulf to have hit home on but one of its points in this appeal, which is as water-logged as Gulf's right of way, we affirm in part and reverse in part.

The facts, as found by the district court and supported by substantial evidence, are as follows. In 1963, Pembroke granted to Gulf a right of way 100 feet in width across two adjoining tracts of land, designated as Tracts A and B,[1] "for the purpose of constructing, maintaining and operating four pipe lines." Also granted was the right to dredge a canal within each right of way not to exceed 45 feet in width in which to lay the pipelines. The parties further agreed, under Article XI of the contract:

> If the Grantee fails to carry out . . . every obligation agreed to by it herein . . . this right of way shall terminate upon Grantee's failure to correct any non-compliance within sixty (60) days from date of written notice by Grantor of such non-compliance.

> In the event this right of way is terminated for any reason
> (a) Grantee, within ten (10) days after receipt of written request to so do, shall furnish to Grantor . . . a full and complete release of any and all of its rights and claims granted by this right of way or arising from, under or by virtue of this right of way; and,

---

1. There were two separate agreements, one executed on September 23, 1962, and the other on April 25, 1963. The agreements were identical except for the date of execution and the tract of land involved. Suits were filed separately on each tract, and the cases were consolidated. Jurisdiction was predicated on the basis of diversity of citizenship.

(b) Grantee shall . . . within ninety (90) days of written request of Grantor, remove its pipe lines, and replace the dams made hereunder, to the extent directed by Grantor.

In addition to any and all rights which Grantor may have by law to enforce this agreement or for damages (Grantor hereby specifically reserving same), Grantee agrees and guarantees that in the event it fails to comply with Clause (a) or Clause (b), or both, set forth in the foregoing paragraph, it will pay to Grantor as liquidated damages for the mere delay in complying with said clause or clauses:

(1) $100.00 (One Hundred Dollars) per day, counting from the date of the cause of the termination until compliance with the pertinent clause or clauses has been accomplished;

(2) Legal interest on said liquidated damages counting from the date of the cause of termination until paid;

(3) All court costs necessary to enforce the provisions hereof; and,

(4) Reasonable attorney's fees of not less than $5,000.00 (Five Thousand Dollars).[2]

Prior to January, 1964, Gulf dredged the original canal and completed laying two pipelines. On October 29, 1964, Pembroke notified Gulf that the canal was being widened by boat traffic, that various no trespassing signs were down, and that certain dams were in need of repair. Pembroke demanded that the latter two conditions be corrected. At this time, it is undisputed that the canal in question had reached a width of over 90 feet. Gulf met Pembroke's demands at a cost of over $27,000.00. Gulf thereafter completed laying a third pipeline in December, 1965.

On April 24, 1967, Pembroke notified Gulf that it was their understanding that the width of the canal on Tract A was in excess of 100 feet. Pembroke made demand under the terms of Article XI that Gulf reduce the width of the canal to no wider than 45 feet. On May 15, 1967, the notice was made applicable to Tract B.

Gulf did not correct the alleged deficiency within 60 days, as required. Pembroke thereafter, on July 18, 1967, issued a termination notice in compliance with Article XI, ordering Gulf to remove its pipelines within 90 days and to furnish a release of all obligations within 10 days. Gulf refused all such demands, and suit was filed on September 3, 1969, to require removal of the pipelines and to obtain actual and liquidated damages, and attorneys fees.[3]

At the times suit was filed, it was undisputed that Tracts A and B were covered by 22 and 15 acres of water, respectively, including 11.1849 acres on Tract A and 7.1898 acres on Tract B which would not have been covered had the water been confined within the original 45 foot canal. On Tract A, 2.09 acres of water lay completely outside the 100-foot right of way. The average width of the water-covered area was

---

2. The agreements also provided in pertinent part:

Spoil from said canal shall be deposited on the southerly and easterly banks of said canal in the form of a continuous levee, except where said canal crosses another waterway.

Gulf was also required to maintain dams in the canal at certain points and was prohibited from dredging or using materials from any part of Pembroke's property other than the canal.

3. After a lengthy series of negotiations, on July 6, 1970, Gulf purchased from

Pembroke a right of way 150 feet wide for the purpose of operating four pipelines—the three existing lines and one additional line to be built. Gulf now unquestionably has the right to keep the three existing lines in place. The parties also agreed, however, that the pending litigation would continue without prejudice to the rights of the parties prior to July 6, 1970, except that Pembroke waived any claim for liquidated damages after that date.

111.53 feet on Tract A and 89.60 feet on Tract B.[4]

Gulf first contends, incredible as it may seem, that it has not breached the contract. In order to come to this conclusion, Gulf analogizes the agreement in question to the grant of a servitude —an unspecified grant for a specified purpose.[5] Gulf contends that at a minimum, in order to dredge a canal and lay its pipelines, it was necessary to construct a canal at least 11 feet deep and to make a box cut of sufficient width (38 feet) to permit flotation of barges through the entire length of the premises. Gulf's actions in excavating the canal across the premises and in laying its pipelines would, under this theory, fully comply with the terms of the contract and, more particularly, with the purposes for which they were executed. If loss or damage to the premises resulted by reason of Gulf's exercise of these rights, Gulf argues that Pembroke is restricted to recovery of damages for its actual loss.

█ The easy answer to this contention is that Gulf, knowing full well the implications of its necessary use, should have bargained for a wider right of way. Although it is generally conceded that the grantee of a servitude is entitled to do all that is reasonably necessary for a full and proper enjoyment of the rights granted him under the servitude,[6] the extent of the servitude may be fixed by the terms of the contract.[7] The parties here have clearly limited the servitude to construction of a canal not in excess of 45 feet in width.

█ Gulf first dredged the canal at a width of 45 feet and a depth of 8 feet. Pembroke's property is located in marshy coastal terrain and is subject to tidal overflow. The marshy terrain through which the canal was dredged was unstable to the extent that for each foot dredged vertically there would eventually be lateral subsidence of each bank so as to increase the width at a rate of 2.75 to 3 feet for each foot of vertical depth dredged. All dredging was evidently confined within the original 45 foot grant. Gulf found it necessary to dredge the canal 8 feet deep in order to accommodate the draft of the dredges and the pipe laying barges, and an extra 3 feet to bury the pipelines. Gulf knew full well that the banks of the canal would slide into the water under such conditions. As part of the original project, Gulf made a second excavation to maintain a depth of 8 feet. As a result of this second excavation and further piling soil on the unstable banks, along with the resulting sliding action, water covered an area more than 45 feet wide when the first project was completed. After sliding and caving of the banks behind the dredges continued, Gulf removed the excess soil by bucket dredges in order to maintain a bottom of at least 40 feet in width and a depth of 8 feet.

4. The district court also found that spoil had been deposited outside the 100-foot right of way on 19.9 acres on Tract A and 18.1216 acres on Tract B. Gulf had also deposited spoil on the northern bank of the canal in some areas so that the spoil bank did not form a continuous levee on the southern bank of the canal as required by the contract.

The court found that both these facts constituted a further breach of Gulf's agreement with Pembroke. The effect of these breaches was not determined, however, because the trial court correctly held that only one breach was necessary for termination of the contract. Our determination that the district court did not err in finding a breach from Gulf's flooding operations renders unnecessary any discussion of whether the deposit of spoil could cause termination of the contract in the absence of any notice of deficiency.

5. *E. g.*, Duet v. Louisiana Power & Light Co., E.D.La.1958, 169 F.Supp. 184; Williams v. Northern Natural Gas Co., N.D. Iowa 1955, 136 F.Supp. 514; Grayson v. Lyons, Prentiss & McCord, 226 La. 462, 76 So.2d 531 (1954); Givens v. Chandler, 143 So. 79 (La.App.1932).

6. LSA–C.C. art. 771 (1952); 1 Thompson, Commentaries on the Modern Law of Real Property § 368 (1939); 2 *Id.* § 572. *See also* cases cited in note 5, *supra.*

7. 5 Restatement, Property § 482 (1944).

The district court found as a matter of fact that the canal reached its present width primarily as a result of Gulf's dredging and piling soil on the banks of the canal, and was not a result of either normal or disastrous water action in conjunction with any depth requirement. The court found that it was possible to dredge a canal with sloping banks 8 feet deep and no more than 45 feet wide. Sloping the banks would have prevented their sliding into the excavation. Instead, Gulf, for its own purposes and knowing full well the probable result, chose to attempt to dredge and excavate 8 feet deep and 45 feet wide without the required slope. The parties clearly intended to include in the definition of "canal" everything covered by water as a result of dredging, and the contract, executed after extended arms-length bargaining, specifically provided for a canal not in excess of 45 feet in width. These findings are supported by substantial evidence and fully support the district court's finding that Gulf breached the contract.

■ Gulf next contends that, assuming a breach, there was still no termination of the contract. This contention rests on a construction of Article XI which must be made with tongue in cheek. Gulf contends that under the terms of the contract it has no obligation to correct an alleged breach until Pembroke proves in a competent court that there actually has been a breach. Gulf would thus have us hold that the contracts in question will terminate only if Gulf fails to correct its breach within sixty days of written request of Pembroke after a *final* judicial decree that the contracts have been breached.

■ It is not disputed that dissolution of a contract may only be obtained by judicial decree and that a party may not unilaterally declare a dissolution, or have the power to do so under the terms of the contract. *See* Urania Lumber Company v. Louisiana Tax Commission, 171 La. 973, 132 So. 650 (1931); Jones v. Fowler, 185 So. 40 (La.App.1938); Texala Oil & Gas Company v. Caddo Mineral Lands Company, 152 La. 549, 93 So. 788 (1922). This is in no way contrary to the principle that a contract by its provisions may be terminated upon the occurrence of an event certain and that the breaching party may be called upon in subsequent litigation to respond in damages, actual or liquidated, for the mere delay in performing its obligations. *See, e. g.,* Melancon v. Texas Company, 230 La. 593, 89 So.2d 135 (1956); Pennington v. Drews, 218 La. 258, 49 So.2d 5 (1951). Gulf's contention in this regard hardly merits comment. It is enough to say that it disregards the plain language of Article XI.

Both parties argue that the district court erred in its computation of liquidated damages. Gulf first argues that the contract's liquidated damage clause is penal and hence unenforceable under Louisiana law. This is based on the contention that the stipulated damages are grossly out of line with Pembroke's anticipated actual loss or Gulf's anticipated gain from a breach.

■■ It is well settled under Louisiana law that parties to a contract generally have the unqualified right to stipulate for any amount of liquidated damages in the event of a breach. When the parties thus agree, Louisiana courts refuse to inquire into whether the actual damages suffered equalled or approximated the stipulated amount. Kenny v. Oak Builders, Incorporated, 256 La. 85, 235 So.2d 386 (1970); Southern Construction Company v. Housing Authority of City of Opelousas, 250 La. 569, 197 So.2d 628 (1967). It is said that Louisiana courts will not consider the amount of actual damages in order to get a party out of a bad bargain in the absence of fraud, error, or mistake, Lama v. Manale, 218 La. 511, 50 So.2d 15 (1951), as long as the stipulations are not contrary to good morals, public policy, or violative of some statutory provision. Morris Buick Company v. Ray, 43 So.2d 83 (La.App. 1949).

■■ There appear to be only a few minor exceptions to these general principles. When the primary obligation of a

contract is solely the payment of money, the parties may be precluded by the usury statutes from setting a liquidated amount in excess of the maximum allowable rate of interest. Ekman v. Vallery, 185 La. 488, 169 So. 521 (1936). Moreover, the relationship between actual damages and the liquidated damage provision may be considered when Louisiana courts are seeking to determine whether a damage clause constitutes an absolute prohibition against competition in violation of LSA–R.S. 23:921 (1964). McCray v. Cole, 236 So.2d 863 (La.App. 1970); Gauthier v. Magee, 141 So.2d 837 (La.App.1962).

■ Neither of these two exceptions to the general Louisiana rule are applicable to the instant case. The district court, therefore, had no authority to consider the reasonableness of the liquidated damage provision. The liquidated damages bargained for in the instant contract, even if not in line with the contemplated actual damages at the time of the making of the contract, were clearly valid in Louisiana.

■ Both parties allege error in the district court's determination of the date on which liquidated damages are to begin. Pembroke contends that damages should run from the date of the original breach in 1963 despite the fact that it did not notify Gulf of the deficiencies for over 2½ years.[8] By this construction, Pembroke could enhance its damages under the contract for mere delay by its own procrastination in notifying Gulf of a breach. The district court concluded this could not have been the intent

of the parties under a reasonable construction of the contract, and we agree.

Gulf contends that damages should not begin to run until sixty days from the date of final judgment in this case. This contention rests on the same line of "reasoning" as that utilized in its contention that the contract has not as yet been terminated. We find it to be equally without merit.

The district court started liquidated damages on April 24, 1967 on Tract A and May 15, 1967 on Tract B, the dates upon which Pembroke gave notices of deficiency to Gulf for the first time. In the district court's opinion, more that a breach was necessary for termination of the contract. The breach itself could not, therefore, be the "cause" of the termination under Article XI. Instead, the district court held that both a *breach* and a *notice* of deficiency were necessary for there to be a termination of the contract.

We find error in this construction. By the terms of Article XI, Gulf had sixty days after the notices of deficiency in which to correct its breach. The cause of the termination was, therefore, Gulf's failure to "correct any noncompliance within 60 days from that date of written notice by (Pembroke) of such noncompliance." The fact of noncompliance could not be determined until sixty days after the notices of deficiency. We find, therefore, that liquidated damages should have begun sixty days from the notices of April 24, 1967 and May 15, 1967.[9]

8. Pembroke, for this position, relies on cases holding that an active breach *automatically* terminates the contract. *See* Melancon v. Texas Company, 230 La. 593, 89 So.2d 135 (1956); Noel Estate, Inc. v. Louisiana Oil Refining Corp., 188 La. 45, 175 So. 744 (1937). Although this may generally be true, it in no way conflicts with the principle that the terms of the contract govern the parties' rights. In the instant case, such a construction would disregard the plain intent of Article XI.

9. Assuming, as Gulf contends, that it was necessary in the instant case for Pembroke to put Gulf in default before liquidated damages could begin to run, City of Baton Rouge, La. v. Robinson, 5th Cir. 1942, 127 F.2d 693; Steel Construction Co. v. Louisiana Hwy. Comm., E.D. La.1945, 60 F.Supp. 183; Southern Construction Co. v. Housing Authority, 250 La. 569, 197 So.2d 628 (1967); Haffner & Taylor v. Perloff, 174 La. 687, 141 So. 377 (1932), this fact fails to support Gulf's contention. Gulf was clearly put in default by Pembroke's deficiency letters of April 24 and May 15.

Gulf alleges that Pembroke's action is barred by the doctrines of waiver, estoppel, laches, and prescription. The district court, on substantially adequate legal and factual bases, negated the application of each of these doctrines in the instant case. It is enough to say that we, like the district court, find no basis in fact or in law to the contentions and find it unnecessary to repeat the well-reasoned opinion of the district court in this regard.

Gulf ends its case by contending that the district court's determination of actual damages was without factual basis. The court found, on the basis of expert testimony, that the use of the land's surface had a value of $600.00 per acre. For that portion of water-covered land outside the right of way, 2.09 acres, the court awarded the full $600.00 per acre, reasonably concluding that the use thereof was completely destroyed. For the acreage covered by water due to the excess width of the canal within the right of way, the court assessed the damages to Pembroke at $300.00 per acre (one-half of its use value). Gulf contends that the absence of evidence of value before and after the injury, cost of replacement less depreciation, or cost of restoration renders this finding erroneous.

There was evidence from which the district court could determine that the value of the *use* of the land was $600.00 per acre and that the use of the land was completely destroyed by Gulf's actions. The percentage of use enjoyed by Pembroke under the agreements was then used to compute the actual damages. We do not consider such a computation erroneous, but rather find it to be eminently reasonable under the circumstances. We, therefore, affirm the district court's findings in this regard. *See* Angelloz v. Humble Oil & Refining Company, 196 La. 604, 199 So. 656 (1942).

In conclusion, Pembroke contends that the district court erred in failing to award attorneys fees in excess of the $5,000.00 minimum provided in each of the contracts. No direct, affirmative evidence of what amount would reasonably compensate the attorneys for their participation was introduced at trial. It is well settled that in cases in which attorneys fees are allowed, absence of proof that fees have been paid or that an obligation has been incurred to pay defeats recovery. Melancon v. Texas Co., 230 La. 593, 89 So.2d 135 (1956); Rhodes v. Collier, 215 La. 754, 41 So.2d 669 (1949); Burglass v. Villere, 170 La. 805, 129 So. 209 (1930); Alfano v. Franek, 159 La. 498, 105 So. 598 (1925); Whitney-Central Nat'l Bank v. Sinnott, 136 La. 95, 66 So. 551 (1914). The complete absence of proof on this issue is, therefore, dispositive and fully supports the district court's judgment.

We, therefore, affirm in part and reverse in part.

Costs will be taxed three-fourths against appellant and one-fourth against appellee.