445 So.2d 1286 (1984)
C & A TRACTOR COMPANY, Plaintiff-Appellee,
v.
HOLLAND AMERICAN INSURANCE COMPANY, et al., Defendants-Appellants.
No. 83-321.
Court of Appeal of Louisiana, Third Circuit.
February 1, 1984.
Rehearing Denied February 29, 1984.
Writ Denied April 23, 1984.
*1287 Provosty, Sadler & deLaunay, Albin A. Provosty, Alexandria, for defendants-appellants.
James Lee and John Bennett, Marksville, La., for plaintiff-appellee-appellant.
*1288 McLure & McLure, John G. McLure, Alexandria, William Yarno, Marksville, for defendant-appellee.
Before GUIDRY, CUTRER and STOKER, JJ.
CUTRER, Judge.
This appeal arises out of a suit for damages due to a fire loss of some harvesting equipment (combine).
C & A Tractor Company (C & A), a farm equipment dealer in Marksville, Louisiana, filed suit against Holland American Insurance Company (Holland) seeking to recover the damages due to the fire loss of a combine. C & A, in the alternative, sought recovery from Edgar Coco Agency (Coco) and its errors and omissions insurer, St. Paul Fire & Marine Insurance Company (St. Paul).
Holland denied coverage. Holland filed a third party demand against Elton Bernard, alleging that, if Holland should be cast in judgment, it should have judgment against Bernard, the farmer who had possession of and was using the combine at the time of loss.
Upon trial of the case, the jury made a finding as follows:

"2. In favor of plaintiff, C & A Tractor Company and against defendants, Edgar Coco Insurance Agency and St. Paul Fire and Marine Insurance Company, its insurer, in solido, in the full sum of $62,126.32 plus costs."

Pursuant thereto, judgment was rendered in favor of C & A and against Coco and St. Paul for $62,126.32. The suit was dismissed as to Holland along with Holland's third party demand against Bernard. Coco and St. Paul appealed. C & A also appealed and answered the Coco and St. Paul appeal contending that it is entitled to judgment against Coco and St. Paul or, if not, it should have judgment against Holland.
This appeal presents two issues:
(1) Whether Holland's existing "floater policy" with C & A provided coverage of the combine at the time of the loss; and
(2) If Holland's policy provided no coverage, whether Coco and its errors and omissions insurer, St. Paul, was liable under the facts and circumstances presented.

HOLLAND'S COVERAGE
In February 1981, C & A obtained a new combine from the Sperry New Holland (Sperry) manufacturer. The items had an invoice price of $62,126.32. C & A had a "floor plan" arrangement with Sperry, wherein the combine was consigned to C & A for nine months. During the nine months period, Sperry provided casualty insurance on the equipment. After that period of time, C & A was required to pay Sperry for the combine and to acquire its own insurance coverage if it desired. The combine was scheduled to come off the consignment agreement at the end of November 1981.
In August 1981 (while the combine was still insured by Sperry), C & A, through its manager, Rick Rozas, began negotiations with Bernard, a long-standing customer, for the sale of the combine to Bernard. Bernard was a soybean farmer and harvest time was approaching. In October an agreement between Rozas and Bernard was reached as to price. The combine and header were delivered to Bernard's farm on October 24, 1981.
As to payment of the purchase price, Bernard told C & A that he would make arrangements with the Cottonport Bank to pay the purchase price around December 1, 1981, which would be after harvest. C & A contacted the Bank and was informed that, barring some unforeseen catastrophe, Bernard's farming finances at the Bank would be in such a position that a loan could be made for the payment.
On this same date the parties signed a purchase order which contained a notation "purchaser will postdate a check 11/15/81."
After this conversation and on the same day, Rozas asked Bernard to sign the postdated check (November 15th) for the purchase price. Bernard had felt that, weather *1289 permitting, he may be able to finish harvest by that time. Weather and equipment problems caused Bernard to be delayed on his harvest until late December.
C & A waited until late November to present the check for payment. The check was returned as "N.S.F." C & A's visit to the district attorney to file charges on the check was unsuccessful as this was a postdated check. After the postdated check was returned, C & A borrowed money from the Cottonport Bank and paid Sperry for the combine.
On December 10th, "Rick" Rozas, realizing that the Sperry insurance coverage had expired, instructed his secretary, Dorothy Pointer, to call Coco to obtain insurance coverage on the combine in question. "Rick" Rozas testified that, after the postdated check bounced, he considered that C & A still owned the combine and that is the reason he became concerned about coverage.
Holland had created a special insurance package for the members of Deep South Equipment Dealers' Association. This coverage, called a "floater policy," included casualty protection for the dealer's inventory stock. C & A was a member of the association and had previously purchased such a policy from Coco. The policy covered C & A's inventory stock up to the amount of $75,000.00.
Dorothy Pointer, C & A's secretary and bookkeeper, called Coco and talked to Henrietta Bordelon who had been attending to the C & A account. Ms. Pointer told Ms. Bordelon that they wanted to obtain coverage on the combine in question.[1] She gave Ms. Bordelon the serial numbers and price of the combine. Ms. Bordelon told her that she would add the combine to C & A's existing "floater policy" and increase the amount of coverage.
The combine was added to C & A's "floater policy" and on December 25th, Rozas received word that the combine had been destroyed by fire while being used by Bernard. Coco was notified of the loss that same day and again Coco assured Rozas that the loss was covered by Holland. Later, Holland refused to pay for the loss on the ground of no coverage.
Holland's "floater policy" contained the following exclusion:
"2. This policy does not cover:
* * * * * *
(b) Property sold by or under encumbrance to the Insured or property leased or rented by the Insured to others after it leaves the custody of the Insured or an employee of the Insured (but this exclusion shall not apply to property in the custody of a carrier for hire for the purpose of delivery at the risk of the Insured);"
This provision would clearly exclude coverage to the combine if a sale had been confected between C & A and Bernard. The question then arises as to whether such a sale took place.
The necessary elements of a sale are set forth in LSA-C.C. articles 2439 and 2456.[2] According to these articles, ownership and the risks attendant with that ownership pass to the purchaser of a movable as soon as there is an agreement between the seller and the purchaser regarding the object of the sale and the price to be paid, even if the object has not been delivered to the purchaser or if the price has not been paid. We have previously set forth the circumstances surrounding the transfer of *1290 this combine to Bernard in October 1981. The parties agreed upon the thing (combine) and the price. When this occurred, sale was complete under our law. The sale was made on credit. A credit sale is evidenced by the fact that a postdated check was given by Bernard and the information obtained by C & A from the Cottonport Bank as to Bernard's ability to obtain funds after harvest.
In a credit sale in this state, the seller does not retain title to the property.[3] The ownership is transferred to the buyer and the seller is afforded a vendor's lien by law.[4] Ownership vested in Bernard in October 1981, and, as such, the "floater policy" previously issued by Holland to C & A to provide coverage to its inventory stock, provided no coverage on this combine. Holland was correctly dismissed from the suit.
C & A's contention, that Holland's policy should have been reformed to provide coverage, is without merit. Under the facts of this case, as will be discussed later in this opinion, there was never any intention of the parties to extend the policy to a non-owned combine.

LIABILITY OF COCO AGENCY
As to the duties of an insurance agent, this court has stated:

"The law is well settled that an insurance agent, who undertakes to procure insurance for another, owes an obligation to his client to use reasonable diligence in attempting to place the requested insurance and to notify the client promptly if he is unable to do so. The client can recover from the agent the loss he sustains as a result of the failure to procure such coverage if the agent's conduct warrants the assumption by the client that he is so covered. Stacy v. Petty, 362 So.2d 810 (La.App. 3 Cir.1978); Karam v. St. Paul Fire & Marine Insurance Company, 281 So.2d 728 (La.1973)."

Trahan v. Bailey's Equipment Rentals, Inc., 383 So.2d 1072, 1076 (La.App. 3rd Cir.1980), writ den., 390 So.2d 1342 (La. 1980), and 391 So.2d 455 (La.1980).
As we examine the facts in this case we conclude that Coco used reasonable diligence to provide the requested insurance.
Ms. Pointer had been working with C & A for six years as a bookkeeper and secretary. She was well acquainted with the routine business affairs of C & A. She testified that, at the time she called Ms. Bordelon at Coco for coverage of the combine, she considered C & A as being the owner of the combine since the postdated check had bounced and Bernard had made no payment otherwise on the combine. Her testimony in this regard was as follows:
"Q. So, then, as far as you were concerned when you called her, C & A Equipment Company owned the combine?
"A. In my mind, yes, whether it's on consignment or in paid inventory. As long as it's on the lot, I consider it owned by C & A.
"Q. All right. Did you consider it owned by Elton Bernard?
"A. No, sir.
"Q. Did you consider it owned by anyone else?
"A. No, sir."
As to the conversation with Ms. Bordelon, Ms. Pointer could not recall the details but did remember that she gave Ms. Bordelon the serial number and price of the combine. She also stated that she told Ms. *1291 Bordelon that a customer had "finances pending."
C & A was owned by "Buster" Rozas and operated by his son, "Rick." "Buster" Rozas operated several businesses around the Marksville area. He testified that he would assist his son occasionally in the operation of C & A. He stated that they were anxious to sell the combine in question as it had been on their lot for several months. He was well acquainted with Elton Bernard who was a regular customer of C & A. After finding that Bernard was interested in the combine, he entered into the negotiations with Bernard. The price had been agreed upon by Bernard and "Rick" Rozas. "Buster" Rozas then entered the picture when the financing of the combine took place.
"Buster" Rozas went to the Bank with Bernard to discuss Bernard's prospects of getting a loan to pay for the machine when Bernard's harvest was completed. The Bank official told them that he felt that when harvest was completed they would be able to loan Bernard the money to pay for the machine. Rozas stated that he did not feel real comfortable with the Bank's response and, after he and Bernard went back to C & A's office, a discussion ensued in regard to the postdated check. Bernard felt that, with this additional combine, he could complete his harvest around December 1st. After further discussion it was agreed that the check would be dated November 15th. After a deposit of the check in late November and a return of N.S.F., "Buster" Rozas became concerned about insurance coverage. He testified very candidly that he pulled the "biggest boner of all" when he accepted the postdated check.[5]
He stated that after the check bounced, "I figured the combine was mine and I'm talking about C & A Tractor." He then told his son to see that coverage was obtained on behalf of C & A.
"Rick" Rozas testified that this was the first time he had used a postdated check as a procedure for payment. He admitted that, on December 10th, when he instructed Ms. Pointer to call Coco for coverage, he considered C & A to be the owner of the combine.
We have pointed out the fact that "Buster" Rozas, "Rick" Rozas and Ms. Pointer all considered C & A to be the owner of the combine, at the time Ms. Pointer called Ms. Bordelon to provide coverage. This testimony supports Ms. Bordelon's statement that she was told by Ms. Pointer that the combine was inventory stock and thus owned by C & A at the time of the call.
Ms. Bordelon testified that, when she received the call from Ms. Pointer, she made notes on a memorandum sheet in order to properly fill the request of C & A. This memorandum was kept in C & A's file and introduced into evidence in the case.[6] Ms. Bordelon's testimony pertaining to this memorandum was as follows:
"Q. Okay. Now, Mrs. Bordelon, Mr. Bennett showed to Mr. Coco a xerox copy of a document. Do you have a memo in your possession that would reflect anything concerning your conversation of December 10, 1981 with Mrs. Pointer?
"A. Yes, I have the original.
"Q. Now, would you look at that. Is there anything written on it?
"A. A full description of the combine and the parts.
"Q. Excuse me, a minute. Answer my question first. Anything written on it?
"A. Yes.

*1292 "Q. All right. Now, you're looking atare these things written on both sides of it?

"A. Yes, there is.

"Q. All right. What side are you looking at?

"A. The description of the combine.

"Q. Whose writing is that?

"A. It's mine.

"Q. When did you make that writing?

"A. When I got the message on 12-10.

"Q. Where did you get the information that is on that piece of paper?

"A. From Dorothy at C & A Tractor.

"Q. Now, therewhat is at the top?

"A. It says 1980 TR-70 and then she changed it to an 85 combine.

"Q. What appears next?

"A. This paid inventory.

"Q. Where did the two words paid inventory come from?

"A. Dorothy.

"Q. What does paid inventory mean to you?

"A. It's equipment that the insured owns.

"Q. What comes next?

"A. The value.

"Q. What comes under that?

"A. Owned by C & A Tractor.

"Q. Who gave you the value?

"A. Dorothy.

"Q. Who said owned by C & A Tractor?

"A. Dorothy.

"Q. What comes next?

"A. Increase value of floater.

"Q. And, then, what comes after that?

"A. Serial number.

"Q. All of that is your writing?

"A. Yes, uh-huh."
Ms. Pointer, as we have previously said, could not recall the details of the conversation with Ms. Bordelon.
We have detailed the testimony of these parties which leads us to the conclusion that Ms. Bordelon was informed that the combine was "inventory stock" and owned by C & A when the request for coverage was made by Ms. Pointer. Having been informed as such by C & A, she added the combine to C & A's existing "floater policy" and the limits of coverage were increased later to $140,000.00. By adding the combine to the "floater policy," coverage would have existed if the combine was inventory stock and owned by C & A. Ms. Bordelon, after discussing the request with Andre Coco, fulfilled the request of C & A according to the facts as related to her by Ms. Pointer. The assumption by "Buster" Rozas, "Rick" Rozas and Ms. Pointer that the combine was still owned by C & A when the request for coverage was made on December 10, 1981, was error which led to the lack of coverage. Ms. Bordelon was given no information that would have led her to believe that any other type of coverage should be provided.
Ms. Bordelon stated that, if she had been told that Bernard was the owner at the time, with C & A as lien holder, she could have placed the coverage with another insurance company, listing Bernard as owner and C & A as lien holder. Since she received no such information she added the combine to the "floater policy."
We are fully aware that a jury finding should not be overturned unless it is found that the jury was clearly wrong in its finding. We have thoroughly examined the record and have concluded that Ms. Bordelon and Andre Coco used reasonable diligence in fulfilling the request according to the facts given by C & A. Unfortunately those facts were erroneous and C & A had no coverage at the time of the loss. The lack of coverage, however, cannot be attributed to any lack of diligence by Coco.
We conclude that the jury was clearly wrong in its conclusion that Coco and its insurer are liable for the loss in this case. We must reverse the trial court judgment in this regard.
For these reasons, the portion of the trial court judgment awarding C & A Tractor Company $62,126.32 against Coco Insurance *1293 Agency and St. Paul Fire & Marine Insurance Company is hereby reversed and dismissed. In other respects the trial court judgment is affirmed.
The costs of the trial court and this appeal shall be paid by plaintiff, C & A Tractor Company.
REVERSED IN PART; AFFIRMED IN PART.
NOTES
[1] We shall discuss the details of this conversation later in this opinion.
[2] LSA-C.C. art. 2439 provides:

"The contract of sale is an agreement by which one gives a thing for a price in current money, and the other gives the price in order to have the thing itself.
"Three circumstances concur to the perfection of the contract, to wit: the thing sold, the price and the consent."
LSA-C.C. art. 2456 provides:
"The sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object and for the price thereof, although the object has not yet been delivered, nor the price paid."
[3] Louisiana does not recognize the common law concept of the "conditional sale" of a movable, whereby the seller retains title until the price has been paid. Succession of Dunham, 408 So.2d 888 (La.1981); Haymon v. Holliday, 405 So.2d 1304 (La.App. 3rd Cir.1981).
[4] LSA-C.C. art. 3227 provides:

"He who has sold to another any movable property, which is not paid for, has a preference on the price of his property, over the other creditors of the purchaser, whether the sale was made on a credit or without, if the property still remains in the possession of the purchaser.
"So that although the vendor may have taken a note, bond or other acknowledgment from the buyer, he still enjoys the privilege."
[5] "A. Yes, Mr. Bernard met me at the C & A Tractor place and we met with Rick and like I say, I had never gotten into, this deep into any deal, and I guess maybe I pulled the biggest boner of all. I think it was at my suggestion that I accepted a post dated check. I wanted to post date it fifteen days. He asked for twenty-one days and I had to settle for that."
[6] "Buster" Rozas' testimony supports the fact that the memo was part of C & A's file. He testified that on the day of the loss, he was discussing the situation with Andre Coco and that he noticed the memorandum slip in Coco's file.