**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 91-3394

_____


OPAL MENNELLA,

                                          Plaintiff-Appellant
                                          Cross-Appellee,

                    versus


KURT E. SCHON E.A.I., LTD., ET AL.,

                                          Defendants-Appellees
                                          Cross-Appellants.



_____

No. 91-3747
_____


OPAL MENNELLA,

                                          Plaintiff/Counterlaim
                                          Defendant-Appellee,

                    versus

KURT E. SCHON E.A.I., LTD., ET AL.,

                                          Defendants/Counterclaim
                                          Plaintiffs-Appellants.



_____

No. 91-3857
_____


OPAL MENNELLA,

                                          Plaintiff-Appellant,

                    versus

KURT E. SCHON E.A.I., LTD., ET AL.,

                                          Defendants-Appellees.

Appeals from the United States District Court
For the Eastern District of Louisiana

Before POLITZ, Chief Judge, SMITH and BARKSDALE, Circuit Judges.

POLITZ, Chief Judge:

In these consolidated appeals, the parties dispute the ownership of a masterpiece painted by Sir Anthony Van Dyck. Mrs. Opal Mennella complains of the district court's summary judgment dismissal of her claim of conversion and denial of sanctions; Kurt E. Schon, E.A.I., Ltd., et al., complain of the court's award to Mrs. Mennella of certain payments she made on the painting and of the dismissal of their claim of defamation. Concluding that the question of ownership is controlled by basic principles of property and contract law as adopted and codified in the Louisiana Civil Code, and concluding that Schon's defamation suit is without merit, we affirm the district court except as relates to recovery of interest by Mrs. Mennella.

## Background

This *mise en scene* began in the Spring of 1988 when Mrs. Mennella agreed to purchase a painting from Schon's New Orleans art gallery. She previously had purchased two paintings from Schon and had admired this piece on previous visits. The painting, entitled "Princess Mary, Eldest Daughter of King Charles I, Mother of King

William III" by the Flemish Master Sir Anthony Van Dyck, was more than 300 years old.[1] Princess Mary married William of Orange; it is their names which identify one of America's first and finest colleges. The purchase price was $350,000. Motivated to purchase, she paid Schon $50,000 with the $300,000 balance, according to the invoice, to be paid on June 1, 1988.

The painting never left Schon's possession. Mrs. Mennella, experiencing cash-flow problems, amicably secured an agreement to pay the balance over a six-month period. By Christmas of 1988, however, she had managed to pay only an additional $90,000. At that point she demanded authentication of the painting to be used to secure a loan to pay the balance of the purchase price. Schon sent an expert's appraisal stating that the portrait was "one of five copies by Sir Anthony Van Dyck."[2] Concerned that the portrait might be a counterfeit, Mrs. Mennella enlisted the aid of her attorneys who moved to void the sale and recover the sum paid. Acting through counsel, Mrs. Mennella repudiated the painting's value, refused to make further payments, and demanded return of the $140,000 paid.

Schon responded by letter on April 25, 1989, a full year after the ostensible sale, that Mrs. Mennella should be satisfied with

---

[1]Van Dyck is, after Rubens, the most prominent Flemish painter of the 17th Century. Under the appointment of King Charles I he served as "principal paynter in ordinary of their Majesties." It was during this period that Van Dyck was Knighted and presumably painted the portrait in question.

[2]The appraisal was conducted in January of 1989. The conclusion was confirmed by a Dr. Erik Larsen in March and reduced to writing in April of 1989.

the authenticity of the painting after receiving a second appraisal. In that letter Schon demanded performance within five days, absent which he would be forced to place the painting back in the active sale stock of the gallery. Mrs. Mennella made no apparent effort to reply or to enforce her rights under the contract. She did not make or tender the agreed price or object to the time period in which Schon demanded payment. Instead, she and her attorneys insisted on referring to the contract as "an agreement to purchase" rather than as a sale, obviously seeking to distance her from ownership and the obligation to pay the balance of the purchase price.

On May 2, 1989, Schon wrote Mrs. Mennella, informing her that he regarded her silence and inaction as a default and that he considered the sale canceled. No money was refunded. Instead, in September Schon offered to either refund $95,000, representing the consideration paid less $45,000 for the cost of authentication and commission paid to Schon's salesman, or to give Mrs. Mennella $140,000 in store credit. Mrs. Mennella rejected both offers.

Without Mrs. Mennella's knowledge, the painting was shipped to Christie's in London where, in November 1989, it sold for more than $1.4 million.

The following month, unaware of the London sale, Mrs. Mennella filed the instant suit seeking recision of the sale and damages, claiming that she only agreed to buy the painting upon "proper authentication and verification." She complained that the painting she agreed to purchase was a fraud and was worth far less than she

4

had agreed to pay.[3]  Schon answered and counterclaimed, alleging defamation.  Informed of the London sale, Mrs. Mennella's attitude markedly changed.  Her lawyers, presumably somewhat chagrined, amended the complaint, claiming that the sale was complete from the start and, as a result, the painting was Mrs. Mennella's and the London sale constituted a conversion.[4]

Based on the pleadings, depositions, and affidavits, the district court concluded that Mrs. Mennella, though entitled to her payments and interest from the day of her demand, was not entitled to the proceeds of the London sale.  Schon's counterclaim for defamation was rejected.  Mrs. Mennella apparently thought this claim to be frivolous and moved for sanctions against Schon for presuming to advance it.  The district court denied the motion for sanctions.  Both parties timely appealed.

Analysis

Sitting as an **Erie** court we are to apply the substantive law of Louisiana.  As an appellate court we exercise plenary review of the application of that law.

The controlling principles of Louisiana law are neither complex nor mysterious.  This dispute is readily resolved by resort to its chronology.  That the parties formed some manner of contract

---

[3]In her original complaint, Mrs. Mennella claimed that she "made verbal demands in early 1989 which were followed by written demand . . . for the return of [her $140,000]."

[4]The amended complaint sought to "amend her [complaint] to state that: Plaintiff is and has been the owner of the [portrait]."

on April 5, 1988 is not disputed. Rather, the dispute concerns the more remote question of whether the painting belonged to Mrs. Mennella so as to lend credence to her claim that Schon's sale of the painting constituted conversion.[5] We must first decide whether the contract supports her claim to ownership.[6]

1.    The nature of the obligation

Whether the contract provided for a present transfer of title depends on the objectively determined intentions of the parties.[7] If the sale was intended to be contingent on adequate authentication and verification, as Mrs. Mennella originally claimed, or on the payment of the purchase price and tender of delivery, as the district court determined, then the obligation would have been "suspensive" under the Louisiana Civil Code. The

---

[5]Conversion is a common-law tort recognized by Louisiana courts as a quasi-offense under Civil Code article 2315. **See, e.g., Holley v. Singletary**, 464 So.2d 410 (La. App. 1985).

[6]Mrs. Mennella's claim to the proceeds flows from her right to the painting. That right is defined by the Civil Code and the contract. One must recall the boundaries of common-law conversion before applying it to the unique relation created by Civil Code sales. Conversion, as the action has evolved, is predicated on (1) the plaintiff's right to possession, and (2) the defendant's exercise of dominion or control over the goods which is in fact inconsistent with the plaintiff's rights. W. Page Keeton, et al., Prosser and Keeton on the Law of Torts, § 15, at 92, 104-05 (5th ed. 1984). If the April contract transferred title and Schon was not within his rights to sell the painting, only then would he be liable in damages under a conversion theory. The key is whether Schon, based on Mrs. Mennella's conduct, had the right to sell the painting.

[7]La. Civ. Code art. 2045 (West 1987); **M.O.N.T. Boat Rental Serv., Inc. v. Union Oil Co. of Cal.**, 613 F.2d 576 (5th Cir. 1980); **Kuswa & Assoc., Inc. v. Thibaut Constr. Co., Inc.**, 463 So.2d 1264 (La. 1985).

6

Code defines a suspensive obligation as one which is "dependent on an uncertain event."[8]  Article 2471 of the Code provides: "A sale, made with a suspensive condition, does not transfer property to the buyer, until the fulfillment of the condition."  If, on the other hand, the sale was not conditioned "on an uncertain event," then title would pass under article 2456 of the Code which provides:

> The sale is considered to be perfect between the parties, **and the property is of right acquired to the purchaser** with regard to the seller, as soon as there exists an agreement for the object and the price thereof, although the object has not yet been delivered, nor the price paid [emphasis added].

After reviewing all relevant indicia of the parties' intentions, we conclude that they did not intend to create a suspensive obligation.

Because we do not have the luxury of a fully comprehensive written contract[9] we must glean the intention of the parties from other sources.  The Civil Code commands our consideration of the "nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties."[10]  We find the conduct of both parties, before and after April 5, 1988, to be instructive.

---

[8]La. Civ. Code art. 1767.

[9]A written contract is not required to accomplish a sale of a movable.  La. Civ. Code art. 2441.  Where the price or value exceeds $500, however, proof of the contract must be proved by at least one witness and other corroborating circumstances.  La. Civ. Code art. 1846.  The summary judgment record contains ample proof of the making of the contract.

[10]La. Civ. Code. art. 2053.

It is clear that Schon regarded the transaction as a perfected sale, one not contingent on authentication or anything else. The day after Mrs. Mennella paid the gallery $50,000, Kurt Schon wrote to congratulate her on the "purchase of the painting." Equally telling, Schon immediately paid his salesman a substantial sales commission.[11] The invoice was straightforward; it described the transaction as a sale without reference to any condition. There was only the notation of the initial payment, amount and due date of the balance, and identification of the portrait.

Similarly, Mrs. Mennella never made any claim to a right to authentication until December, when she was facing financial difficulties and already had paid $140,000 for the painting. We are mindful of and consider significant the fact that the parties had executed two similar contracts without any authentication requirement. Though the present efforts to reverse an earlier position may be the cause of uplifted eyebrows, it appears consistent with the original understanding and prior dealings.

The district court found the sale to be conditioned on both the delivery of the painting and the payment of the purchase price. We find that this reading creates unnecessary tension with the literal language of article 2456 and fails to comport with the accepted civilian rubrics.

Article 1767 defines a conditional obligation as "one dependent on an **uncertain event**." If the anticipated performance

---

[11]Schon later sought to withhold this commission from the refund of Mrs. Mennella's payments.

8

were treated as an uncertain event virtually every bilateral contract would be a conditional obligation and venerable article 2456 would be rendered meaningless. Indeed, if the performance was so "uncertain" as to create a conditional obligation, it would be nigh impossible to treat the exchange of promises as a contract. Louisiana courts long have recognized that the Civil Code does not allow the parties to condition the transfer of title on the payment of the purchase price.[12] Instead, in credit sales, Louisiana courts consistently have held that when the parties consent and agree as to the price and the thing, title passes *instanter*. So sayeth article 2456.

Therefore we are compelled to hold that title to the painting passed to Mrs. Mennella in April of 1988. We must now consider whether that title was divested prior to the London sale.


2.  The execution of the duties under the contract

In support of her claim of ownership of the painting, Mrs. Mennella seizes upon the transfer of title and would ignore all of her subsequent actions. Legal title is not so barren a concept. The Civil Code clearly portends a transfer of title **subject to** the execution of the contract. For example, the seller may wrongfully sell and deliver the object to an innocent third party who would acquire title, provided he has paid fair value.[13] The seller

---

[12]**Haymon v. Holliday**, 405 So.2d 1304 (La. App. 1981).

[13]The Code explicitly accommodates such a result: "The sale is considered to be perfect and the property is of right acquired to the purchaser **with regard to the seller**. . . ." La. Civ. Code art.

retains a security interest in the property[14] pending tender of the purchase price and has the concomitant duty of due care towards the object.[15] The seller has the right to put the buyer in default and to dissolve the contract upon the buyer's failure to perform, and under certain conditions to simply regard the contract as dissolved.[16] That divestment is the principal issue presented by this appeal.

Mrs. Mennella was obliged to carry her end of the bargain, timely payment, just as Schon was obliged to care for and ultimately deliver the painting. Mrs. Mennella's erroneous conclusion that the painting was not authentic caused her to repudiate the transaction, demand a return of her partial payment, and refuse to pay the balance due. This is a course of action she would have been entitled to follow had she been correct in her assumption.[17] That assumption was not correct, however. Indeed,

---

2456. **See also** La. Civ. Code art. 518 ("when possession has not been delivered, a subsequent transferee to whom possession is delivered acquires ownership provided he is in good faith"); Yiannopoulos, 2 Louisiana Civil Law Treatise § 354 (1991).

[14]La. Civ. Code art. 3227; **C & A Tractor Co. v. Holland American Ins. Co.**, 445 So.2d 1286 (La. App.), **cert denied**, 449 So.2d 1348 (La. 1984).

[15]La. Civ. Code art. 2468.

[16]La. Civ. Code art. 2013. See e.g., **Texala Oil & Gas Co. v. Caddo Mineral Lands Co.**, 152 La. 549, 93 So. 788 (1922); **Hay v. Bush**, 110 La. 575, 34 So. 692 (1903). Comment (a) of the 1984 addition of article 2013 cites both opinions.

[17]When both parties to a contract share a mistake of fact involving the essence of a party's consent "the granting of relief presents no problem." La. Civ. Code art. 1949, cmt. (d); see generally, La. Civ. Code arts. 1948-50.

in forming her belief that the painting was a fraud she relied on an appraisal which clearly indicated that the painting was executed **by** Van Dyck. She received repeated assurances from the seller that he would perform, accompanied by repeated demands for her performance. Further, from January to May she made no effort whatever to authenticate the painting or to investigate the credentials of the experts from whom she had received appraisals. Instead, through counsel, Mrs. Mennella made manifest that she had no intention of performing[18] and demanded a return of her money, refusing a "net" refund or a full store credit.

Whether she claims to have been exercising her right to receive adequate authentication under the contract, or an effort to

---

[18]Counsel for Mrs. Mennella concedes that this is the weakest part of their argument: "that it appears as though she didn't want it."

enforce a warranty, there is no excusing Mrs. Mennella's express repudiation and continued refusal to perform after receiving two appraisals. Mrs. Mennella comes before the courts burdened with the troublesome albatross of her repudiation. We may not ignore it.

Mrs. Mennella now offers a somewhat tortured explanation of the legal significance of her failure to perform. Essentially, the argument turns on what she characterizes as Schon's failure to formally accept her offer to rescind the contract. Such obfuscation need not long detain us. That argument ignores the fact that Mrs. Mennella was in default by January of 1989, at the very latest, when the voluntary extension expired. The communication from counsel refusing to proceed and demanding a refund cannot be construed as anything but a definitive refusal to perform. The lamb of her so-called "offer to rescind" cannot lie peacefully beside the lion of her refusal to perform. The fact that she may have based her actions on a mistaken belief that the painting was not genuine[19] does not change the character of her actions; failure to perform does not presuppose a fraudulent intent, only an inexcusable failure to do that which was promised.[20]

If accepted at face value, the argument by counsel for Mrs. Mennella would stand the law of contracts on its ear. Contracts bind persons to the assigned risks and benefits. Mrs.

---

[19]Neither may her failure to receive what, by her estimation, was sufficient evidence of authentication -- a right she did not have -- serve as an adequate excuse for her failure to perform.

[20]**See generally, Robertson v. Buoni**, 504 So.2d 860 (La. 1987).

Mennella would blithely shift the benefits and the corresponding burdens as best suits her most immediate interests.  She may not do so.[21]

We conclude that Mrs. Mennella's written communication through counsel refusing to perform may justly be treated as an anticipatory repudiation[22] and that her failure to pay the balance in the extended period allowed for same constituted an active repudiation of the contract.

3.  Dissolution

Dissolution of the contract would terminate Mrs. Mennella's property rights in the painting.  Indeed, this was the prayer of Mrs. Mennella's initial lawsuit.  The final question before us is whether Schon secured a dissolution before the London sale.

When faced with Mrs. Mennella's refusal to perform Schon had three choices.  He could:  (1) sue to enforce performance or to secure a judicial dissolution; (2) continue to seek performance albeit in an untimely manner; and/or (3) put Mrs. Mennella in default and, if she failed to correct same, regard the contract as

_____

[21]La. Civ. Code art. 2055; **see also Douglas Oil Tools, Inc. v. Demesnil**, 552 So.2d 77 (La. App. 1989) (representations which are relied upon to a party's detriment give rise to estoppel).  **See also Ranger Nationwide Ins. v. American Cas. Co.**, 658 F. Supp. 103, 108 (D. Del. 1987) ("A party who breaches a contract may not rely on the benefits of that same contract."), aff'd, 833 F.2d 306, 307 (3d Cir. 1987).

[22]Litvinoff, Law of Obligations in the Louisiana Jurisprudence, 371 (2d ed. 1985) ("[A] situation that could be characterized as an anticipatory breach at common law can be regarded as an active violation of the contract in Louisiana.").

dissolved.

Initially, Schon opted for the second choice; he invited untimely performance. Seeking to accomodate Mrs. Mennella's cash-flow problems, he agreed to a modification of the contract, extending the $300,000 payment from June until the following January. He then provided two appraisals to assuage her voiced concerns regarding the painting's origin.[23] Schon informed Mrs. Mennella she had five additional days to perform; otherwise he would have to consider the sale dissolved. Finally, when Mrs. Mennella made clear that she would not perform, Schon gave her notice that he was treating the sale as canceled and was returning the painting to the active stock for sale.

Recently, revisions to the Civil Code formally adopted a practice the Louisiana courts have long recognized: extrajudicial dissolution.[24] Schon's letters were sufficient to put Mrs. Mennella in default, a prerequisite to dissolution by notice.[25] We find them

---

[23]There is some dispute as to when the Larsen appraisal was sent. It is clear, however, that it was sent by April when Schon still demanded performance. Mrs. Mennella complains that this communication by Schon included a demand for two different prices, one which included interest and one for the contract price. In either event she refused to perform at any price and then waited, saying nothing after receiving Schon's next letter which informed her that the sale was dissolved; indeed, she was still seeking dissolution and disavowing ownership, as late as March, 1990.

[24]Mrs. Mennella cites cases from the 1940s and 1950s suggesting that judicial dissolution was Schon's exclusive remedy. In light of much earlier precedents and the recent amendments to the Civil Code, we can hardly view those decisions as persuasive. See n.16, supra.

[25]La. Civ. Code art. 1991. "An obligee may put the obligor in default by a written request of performance . . . or by filing suit for performance. . . ."

14

sufficient, under the circumstances, to dissolve the contract.

The Civil Code provides that the obligee has a right, in certain cases, to treat the contract as dissolved.[26] The "unilateral, non-judicial dissolution provided for in the revised articles is not a novelty."[27] Under the civilian tradition, the obligor must be notified of his default, given a certain time to perform, and warned that the contract will be considered dissolved if performance is not rendered.[28] The time set must be reasonable according to the circumstances,[29] and the breach must be substantial to justify the dissolution.[30]

The Civil Code is not exhaustive in its description of the circumstances that will entitle the obligee "to regard the contract as dissolved" without litigation. Because the pertinent articles are relatively new, the Louisiana courts have not yet expounded on the issue. Whether a repudiation is sufficiently clear to allow dissolution without litigation undoubtedly will pose a difficult question in some cases. Fortunately for this **Erie** court, this is not one of those cases. Schon prudently waited until Mrs. Mennella unequivocally refused to perform and demanded the return of her

---

[26]La. Civ. Code art. 2013.

[27]Litvinoff, **supra**, at 389.

[28]**Id.**

[29]La. Civ. Code art. 2015.

[30]La. Civ. Code art. 2014.

15

money before notifying her of the default and dissolution.[31] Article 2013, when read in harmony with related articles, such as articles 2014[32] and 2018,[33] allows extrajudicial dissolution where the obligee has received partial payment. The Code makes clear, however, that the obligee is liable for the return of any partial payments unless he has a right to retain them.[34]

Schon's notice is not rendered ineffective by his failure to simultaneously return the partial payments. Article 2018 provides the obligor in default with an action to recover partial payments to the extent they exceed the damages incurred. Article 2013[35] states that the obligee who regards the contract as dissolved has the right to pursue a remedy in damages. The comments to article 2015 (non-judicial dissolution by notice) likewise state that "[a]fter such notice is given, the obligor will be liable for any delay damages that accrue." At the same time, the obligee is duty

---

[31]If extra-judicial dissolution were not appropriate in this case we have difficulty conceiving of a case in which it would be. Such a result would be intolerable as litigation would have to result from every failed sales agreement to clear title.

[32]The article allows dissolution where the obligor has partially performed but the part not rendered substantially impairs the obligee's interest.

[33]That article provides: "If partial performance has been rendered and that performance is of value to the party seeking to dissolve . . ., the dissolution does not preclude recovery for that performance, whether in contract or quasi-contract."

[34]**See, e.g.,** La. Civ. Code art. 2018.

[35]"In either case [judicial or non-judicial dissolution] the obligee may recover damages." La. Civ. Code art. 2013.

bound to mitigate his damages.[36]   We conclude that article 2013,

when read in *pari materia* with other articles,[37] allows the seller

to regard the contract as dissolved and temporarily retain partial

payments when the buyer is in breach.   The seller, of course, is

limited in his actions by operation of article 1759, which provides

that "Good faith shall govern the conduct of the obligor or obligee

in whatever pertains to their obligation."[38]   Thus he may hold only

the funds necessary to compensate for the loss he reasonably

believes he will suffer.   Under the prevailing circumstances, we

conclude that Schon's actions were reasonable and that they were

executed in good faith.

We hold that Schon validly dissolved the contract by notice of

default after it became obvious that Mrs. Mennella would not

perform.   Consistent therewith, we therefore hold that Schon had

legal title to the painting when it was sold in London.


4.    Schon's retention of the payments after the auction

Next we must consider whether the district court erred in

concluding that Mrs. Mennella was entitled to the return of her

payments.   Schon contends that the contract was merely an agreement

to sell and that the presumption is therefore that the money

advanced regardless of the timing, is forfeitable as earnest money.

We have concluded that the contract was a perfected sale, thus

---

[36]La. Civ. Code art. 2002.

[37]La. Civ. Code art. 13.

[38]**See also** La. Civ. Code. art. 1983.

17

Schon is only entitled to the money if he can prove injury from the breach.

Equitable principles enshrined in the Civil Code will not allow Schon to retain the funds paid by Mrs. Mennella and yet resell the painting for a quadrupled sum.[39] Mrs. Mennella is liable to Schon only for the damages she caused him; nothing more.[40] Mrs. Mennella did not cause Schon any damages whatever; in fact, her failure to perform resulted in a magnificent legitimate windfall for Schon.[41] Schon's argument that he could have profited further from holding the painting is pure speculation and is unworthy. Indeed, it is equally possible that the sale at Christie's resulted in a higher price than Schon ever could have received in his gallery in New Orleans. We therefore conclude that Mrs. Mennella is entitled to the full return of her payments with legal interest from the date of the London sale of the portrait.

5.   The remaining claims

Finally, there is the matter of Schon's claim for defamation and Mrs. Mennella's corresponding motion for Rule 11 sanctions. Under Louisiana law, a successful defamation claim requires: (1) defamatory words; (2) publication to someone other than the one defamed; (3) falsity; (4) malice, actual or implied; and (5)

---

[39]**See** La. Civ. Code art. 2018 (allowing recovery after dissolution where partial performance leaves the obligee unjustly enriched).

[40]La. Civ. Code art. 1994.

[41]**Cf.** La. Civ. Code art. 1995.

injury.[42]  The summary judgment record richly supports the district court's conclusion: there is no indication that Mrs. Mennella spoke the allegedly defamatory words;[43] that Mrs. Mennella published the statements, if any, to a third party; that Mrs. Mennella did so with malice, express or implied; or that Schon suffered any injury. We therefore agree with the district court that the action, while not so meritless as to be sanctionable,[44] is without merit.

For the reasons assigned we AFFIRM in part and VACATE and REMAND in part for judgment assessing legal interest as set forth herein.

---

[42]**Borne v. New Orleans Health Care, Inc.**, 580 So.2d 1070 (La. App.), writ denied. 586 So.2d 533 (La. 1991).

[43]Schon fails to bring to our attention any Louisiana case allowing the statements of an attorney to be attributed to his client for this purpose.

[44]Of course the district court's decision not to impose sanctions is accorded great deference. **See** Sam D. Johnson, et al., **The Proposed Amendments to Rule 11: Urgent Problems and Suggested Solutions**, 43 Baylor L. Rev. 647, 661-63 (1991) (discussing **Cotter & Gell v. Hartmarx Corp.**, 496 U.S. 384, 110 S. Ct. 2447, 110 L.Ed.2d 359 (1990) (requiring abuse of discretion review)).  We find no reason to disturb the district court's exercise of discretion in this case.